STANARD, J.
The main question is that which was involved in the case of Turpin & al. v. Locket & al., 6 Call 113, decided in 1804; and in that case the decision of chancellor Wythe, sustaining the validity of the acts of assembly dissolving the vestries and providing for the sale or other disposition of the glebe lands of the protestant episcopal church, was affirmed by an equal division of the judges of the court of appeals. Under those laws, sustained by that decision, the overseers of the poor, in the respective parishes where glebe lands were situated, proceeded to dispose of those lands as they became vacant, and under that authority almost all the glebe lands in the state were disposed of before the year 1830. If this authority was questioned in the courts of the commonwealth, except in the case in judgment, it is presumed it was upheld by the decisions of the intermediate courts, and those decisions were acquiesced in, as the case in judgment is the only one that has been brought up to the court of appeals, in which the validity of those laws was challenged. The case of Claughton v. Macnaughton, 2 Munf. 513, decided in 1811, did not require the court to pass on that question ; yet from the decision of the chancellor, affirmed by the court of appeals, an implication may be fairly made that neither of those courts thought the validity of those laws could be effectually controverted. It may be safely assumed, that from the date of the decision of the case of Turpin v. Locket, until 1830, when the constitution of the state was revised and amended in convention, there was a general acquiescence in that decision by the members and ministers of *the protestant episcopal church, and that the community at large, the legislature, and the courts, considered the validity and constitutionality of those laws established; that the ecclesiastical corporations of the protestant episcopal church were effectually dissolved, and the glebe lands liable to the dispositions prescribed by those laws. It is matter of history that almost all those lands have been disposed of under those laws, and acquired by purchasers, as may reasonably be presumed, in the confidence inspired by the acquiescence of the members and ministers of the church, and the opinions pervading the community, the legislature, and the judicial tribunals of the state, during the long time intervening between the decision of the case of Turpin v. Locket, and the revision of the constitution. During that period, one or more applications have been made to the legislature by one or more religious sects, for acts of incorporation, to enable them to hold and administer more conveniently for the religious objects of the petitioning sect, property to a limited amount, voluntarily contributed for those purposes. It [is well known that such applications encountered in the legislature the twofold objection of their incompatibility with the principles of religious freedom declared by the act of 1785, and of the inexpediency of exercising the power to create such corporation» though it were constitutional to do so; and that, under the influence of one or other of these objections, or of both combined, those applications were rejected by large *582 majorities. Such was the state of things in 1829-30, when the constitution was under the revision of the convention ; a state of things well calculated to produce in that body (what doubtless was the case) a conviction that the corporations of the protestant episcopal church, and all the rights and incidents that pertained to them, were effectually dissolved or abrogated, and a grave doubt at least of constitutional power to create corporations of *or for any religious sect, when (as was done) the principles declared by the said act establishing religious freedom were incorporated in the new constitution as limitations of legislative power. In that convention, an attempt was made to incorporate a provision in the constitution which would have expressly reserved to the legislature a power “of incorporating by law the trustees or directors of any theological seminary, or other religious society or body of men created for charitable purposes or for the advancement of piety and learning, so as to protect them in the enjoyment of their property and immunities, in such case and under such regulations as the legislature might deem expedient and properbut such corporation at all times to be subject to be altered, remodeled or repealed at the discretion of the legislature. This proposition was opposed, and though the mover supposed that the legislature would, without such reservation, possess the power to grant such charters of incorporation, that was not assented to, and the proposition was resisted on the ground that no such power ought to be given or exercised, and was overruled by a very large majority. Without deciding or even considering the influence that the making and rejection of this proposition in the convention may have on the interpretation of the constitution in respect to the extent of the legislative power over the incorporations specified in the proposition, it may, be safely assumed that such a proposition would not have been rejected, had not the convention taken it for granted that the corporations of the protestant episcopal church were at an end. For if they still had legal existence, and were to continue (as the argument in this case must maintain, to entitle the appellants to success) intangible by legislative and even conventional power, then the only means of even approximating other religious sects to an equality of immunities would be to confer and exercise the power of giving them like ^corporate organization and privileges. Whatever may be the true interpretation of the constitution, with the material principles declared by the act establishing religious freedom forming a part of it, coupled with a rejection of the reservation of a qualified power to incorporate religious societies of charitable purposes or for the advancement of piety and learning, I do not doubt that in-corporations of religious sects, providing for church government of the members, and the election or appointment and institution of ministers, are without the scope of legislative power, and incompatible with the principles of the said act, now incorporated in the constitution. It is under these circumstances of long acquiescence in the laws aforesaid, the alienation of almost all the glebe lands, and ingrafting thereon of interests large, complex and multiform, the general assent to and confidence in the decision that warranted such alienation, and the action, during more than a quarter of a century, of the judiciary, legislature and convention, founded on that confidence, that the court is in this case called on to review and reverse the decision in the case of Turpin v. Locket. In such a case the injunction stare decisis is of most commanding authority, and challenges obedience from every judge who is not supported in his dissent by an unhesitating conviction that the decision from which he dissents is clearly erroneous. My examination of this case, so far from yielding such support to an opinion dissenting from the decision in the case of Turpin v. Locket, strongly inclines me to assent to it, and had I been one of the court which decided that case, my impression is that I should have concurred in the opinions that prevailed. But I do not mean to say that had the responsibility devolved on me of deciding that case, the question being then for the first time submitted to judicial decision, I should not have felt it my duty to subject the impression now avowed to a stricter scrutiny than I *have given it, nor do I mean to declare an un-doubting conviction that under such scrutiny it would have ripened into a judicial opinion. It suffices for this case, that such are my ascertained convictions in respect to the main question involved, as to make the rule stare decisis imperative on me, and of course to require me to affirm the decree.
PJEJR CURIAM, Decree affirmed.